IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**RONALD GENE HODGE,**

      **Petitioner,**

  v.                                              Case No. 2:04-cv-1133
                                                          JUDGE FROST
**STATE OF OHIO,**                                 Magistrate Judge KEMP

      **Respondent.**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this action for a writ of habeas corpus pursuant to 28 U.S.C. §2254. This matter is before the Court on the instant petition, respondent's return of writ, petitioner's traverse, and the exhibits of the parties.

For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

## I. FACTS

This case involves the following facts, as summarized by the Tenth District Court of Appeals:

> On December 4, 2001, shortly after midnight, a man armed with a pistol attempted to rob the Wendy's restaurant located on South High Street in the German Village area. Eric Hillstead testified that he was working at the drive-thru window that morning when a man with a gun approached him at the window and demanded money. (Tr. 447-451.) Hillstead told the man that he could not open the register. The man struck him on the arm and fled on foot. (Tr. 453.) Hillstead testified that he got a good look at the man. (Tr. 450-451.) The next day, Hillstead saw appellant's picture in the Columbus Dispatch and recognized him as the man who had attempted to rob him. (Tr. 454-455.) Later, Hillstead selected appellant's picture from a photo array and identified him as the man who attempted to rob him in the early morning hours the night before. (Tr. 452- 454, 457.)

At approximately 1 a.m., on that same morning, the Village Inn, also located on South High Street, was robbed and the night clerk, Sam Specht, was shot and killed. Rhonda Booth-Duvall testified that she was employed as the manager of O'Shea's Sports Club located at 920 South High Street on December 4, 2001. O'Shea's is located in the basement of the Village Inn where Specht worked. O'Shea's could be reached through a door on South High Street and also through a door in the Village Inn lobby. (Tr. 75-80.)

Duvall testified that on December 4, 2001, at one o'clock in the morning there were only two patrons remaining at O'Shea's. As Duvall was preparing to lock-up for the evening, she walked up the stairs leading to the motel lobby. At that time, she heard a loud noise followed by a noise that sounded like a gun shot from the motel. (Tr. 80-82.) Before calling 911, Duvall decided to find out what had occurred. When she heard more loud noises, she decided to exit via the South High Street door and look around. (Tr. 84-86.) Once outside, Duvall heard another noise, turned to her left, and saw a man standing in front of the door she had just exited. He was carrying what she first thought was a television. (Tr. 85-86.) Duvall testified that the area was well lit, and that she was able to get a good look at this man. (Tr. 86-88.)

Duvall saw Patrick Grigsby, one of the customers at O'Shea's, run through the lobby of the motel. She followed him and found Specht lying in a pool of blood behind the desk. Duvall called 911. (Tr. 90-91, 111-113.)

Duvall then entered the back office where the video equipment was kept and noticed that the video camera which monitored the motel lobby as well as the VCR were both gone. She also noted that the cash drawer from the register was open and only had a little bit of change in it as well as some blood. (Tr. 91-117.)

Later, Duvall saw an article in the Columbus Dispatch which included a picture of appellant. Duvall testified that she knew immediately that appellant was the man she had seen carrying the equipment out of the Village Inn. (Tr. 118-119.) Duvall later selected appellant's picture from a photo array shown to her by Detective Carl Rankin. (Tr. 119-122.)

Paul Loeffler testified on behalf of the state. Loeffler was 52 years of age at the time, a 29 year veteran of the Columbus Fire Department, and married. (Tr. 294.) Loeffler testified that, at the time of the

incident, he was involved in a sexual relationship with a man named Jarred Clark, who was living at the South Winds Motel on South High Street, directly across the street from the Village Inn. (Tr. 265-271.) In September 2001, Clark introduced Loeffler to crack cocaine and they smoked it together three to four times a week. (Tr. 267-269.)

Loeffler testified that he first met appellant the Friday before the incident. Clark introduced Loeffler to appellant, whom Loeffler knew as "J.R.," and his step-father, Doug. Appellant was one of Clark's cocaine suppliers. Loeffler and Clark bought cocaine from appellant Friday night at the Village Inn, where appellant was staying. Saturday morning, Loeffler and Clark got more cocaine from appellant and Doug before appellant and Doug left to get more cocaine. Loeffler testified that while they were in appellant's room, Doug had a gun which was jammed. Apparently, appellant told Doug that he would take care of the gun. At that point, Loeffler decided that he and Clark should leave because appellant and Doug were acting very hyper. (Tr. 272-275.)

Loeffler testified further that appellant and Doug came to Clark's room later and they gave appellant money to buy more cocaine. Appellant and Doug left around 8:30 p.m., and came back later informing Loeffler and Clark that they had been ripped off. (Tr. 275-278.) According to Loeffler, appellant and Doug left the motel again around 10:30 p.m., and then returned between 11:30 p.m. and midnight. Loeffler testified that they were both very upset because they had not been able to get any more cocaine. Appellant and Doug left again. (Tr. 278-279.) Thereafter, Loeffler and Clark left the motel and saw appellant coming from the building to the North carrying a black box. Appellant got into his car which was near Loeffler's car. Appellant approached Clark and commented that "the guy grabbed [me] and [I] had to shoot him." (Tr. 279.) Appellant then got in his car and left. (Tr. 279-280.)

At that time, Loeffler considered calling the police; however, he did not because he knew he was somewhere that he should not be and doing things he should not be doing. (Tr. 283.) Loeffler and Clark returned to the area around 2:30 a.m., and noticed that the Village Inn had been cordoned off and there were police cars in the parking lot. At the SuperAmerica, Clark learned that someone had been shot. (Tr. 284.) Loeffler and Clark returned to Clark's room. Clark took a phone call from either appellant or Doug requesting that Loeffler and Clark come to see them at the Budget Hotel. Loeffler drove Clark there and

3

> dropped him off at room nine. At 6 a.m., Clark called Loeffler and arranged for them to meet at the McDonald's on South High Street across from the Great Southern Shopping Center. (Tr. 285-289.)
>
> A little after 7 a.m. Loeffler, Clark, and appellant met at the McDonald's. According to Loeffler's testimony, appellant told him that he had gone to Wendy's and tried to rob the person at the drive-thru cash register; however, he did not have any money. Appellant then told Loeffler that he went to the Village Inn motel, that the guy grabbed him and that he had to shoot him. Appellant told Loeffler that he took the video recorder. (Tr. 289-291.) A police cruiser entered the parking lot and Loeffler felt appellant put what felt like a gun to his stomach. Loeffler explained to appellant that he was not being set-up. After the police cruiser left, appellant put the object away. (Tr. 291-293.)
>
> Loeffler finally decided that he could not keep quiet about what he knew and called a friend of his, Chief Carl Lawhorn, who arranged for Loeffler and Clark to meet with Detective Rankin. At that time, Loeffler told the police everything he knew and the police were eventually able to arrest appellant. When appellant's motel room was searched, the police collected a video machine, broken pieces of black plastic, a piece of black electrical wire, a wooden Smith & Wesson gun box and ammunition for 9 millimeter bullets manufactured by Merc. The video equipment found under the bed in room nine of the Budget Hotel belonged to the Village Inn motel. (Tr. 381-392.) When police attempted to arrest appellant, he fled but was ultimately apprehended. Appellant's step-father Doug shot at the police while they were attempting to arrest him and he was killed by return fire. (Tr. 490-491.) Doug had two guns in his possession, one of which was the murder weapon. (Tr. 520.)

Exhibit 8 to Return of Writ.

## II.  PROCEDURAL HISTORY

Petitioner was indicted by the September 7, 2001, term of the Franklin County grand jury on two counts of aggravated murder, in violation of O.R.C. §2903.01, two counts of aggravated robbery, in violation of O.R.C. §2911.01, burglary, in violation of O.R.C. §2911.12, tampering with evidence, in violation of O.R.C. §2921.12, two counts of having a weapon while under disability,

4

in violation of O.R.C. §2923.13, two counts of robbery, in violation of O.R.C. §2911.02, and kidnapping, in violation of O.R.C. §2905.01, with specifications. Exhibit 1 to Return of Writ. Additionally, he was indicted by the January 4, 2002, term of the Franklin County grand jury on one count of receiving stolen property, in violation of O.R.C. §2913.51. Exhibit 2 to Return of Writ. The cases were consolidated for trial. Petitioner waived his right to a jury trial on counts six and seven of the first indictment. Exhibit 3 to Return of Writ. While represented by counsel, he proceeded to jury trial on the remaining charges, and on October 16, 2002, petitioner was found guilty of aggravated murder, two counts of aggravated robbery, kidnapping, and receiving stolen property, with specifications. After a trial to the court, on October 21, 2002, he was also found guilty of two counts of having a weapon while under disability. Petitioner was sentenced to an aggregate term of life imprisonment without the possibility of parole. Exhibits 4 and 5 to Return of Writ. Represented by new counsel, petitioner filed a timely appeal of his convictions to the Tenth District Court of Appeals. He asserted the following assignment of error:

> The trial court erred to the prejudice of the defendant-appellant by admitting evidence of appellant's prior bad acts.

Exhibit 6 to Return of Writ.[1] On October 16, 2003, the appellate court affirmed the judgment of the trial court. Exhibit 8 to Return of Writ. Petitioner never filed an appeal of the appellate court's decision to the Ohio Supreme Court. However, on August 11, 2003, proceeding *pro se*, petitioner filed a petition to vacate or set aside his sentence with the state trial court. Petitioner asserted the ineffective assistance of counsel due to his attorney's failure to call certain defense witnesses. He

---

[1] Although petitioner raised only one assignment of error, the appellate court noted that he had raised two separate issues on appeal, and therefore also considered petitioner's claim that "the trial court erred in refusing to sever the counts involving attempted robbery of Eric Hillstead at Wendys." *See* Exhibit 8 to Return of Writ.

5

also asserted that the trial court had improperly overruled his motion for judgment of acquittal based upon insufficient evidence.  *See* Exhibits 9 and 12 to Return of Writ.  On March 2, 2004, the trial court denied the petition.  Exhibit 12 to Return of Writ.  Petitioner never filed an appeal of the trial court's decision to the Tenth District Court of Appeals.  However, on August 19, 2004, he filed a delayed application to reopen his appeal pursuant to Ohio Appellate Rule 26(B).  On December 9, 2004, the appellate court denied the application for failure to show good cause for the untimely filing.  Exhibit 14 to Return of Writ.  Petitioner never filed an appeal of the appellate court's decision to the Ohio Supreme Court.

On November 29, 2004, petitioner filed the instant *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254.  He alleges that he is in the custody of the respondent in violation of the Constitution of the United States based upon the following grounds:

> 1.  Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant and attorneys evidence favorable to the defendant.
>
> Statement and testimony by Jarrold Clark on his whereabouts and knowledge of the true shooter of the crime I was convicted of [sic].
>
> The DNA and powder burn testing of Vernon Watts, the stepfather, who was shot and killed in a shoot out with Columbus police officers, and the withholding of the recorded statement of Eric Hillstead and Ronda Boothdeval, witnesses [sic].
>
> 2.  Conviction obtained by action of a grand jury which was unconstitutionally selected and impaneled.
>
> Jurors asleep during trial phase, juror #6 and #7, see page 842-843, also pages 842-840 [sic] of trial transcripts.  Also, jurors told trial attorneys that they had doubt about me being the shooter after I spoke to them during the unsworn statement phase of trial.  I did not take the stand because attorneys said I would be found not guilty.
>
> 3.  Denial of effective assistance of trial counsel.

> [Trial counsel failed to file] a written motion to sever counts of the indictment. There [were] so many thing[s] said off of the trial record during the *voir dire* process that were damaging to the reason on why the judge did not rule in favor of defendant and appellant [sic], notice of plain error is to be taken with the utmost caution and a miscarriage of justice [sic].
>
> 4. Denial of effective judge for trial.
>
> A trial court may not instruct a jury that it must unanimously acquit a criminal defendant of a greater offense before it may consider a lesser offense.

It is the position of the respondent that all of petitioner's claims are procedurally defaulted.

### III. PROCEDURAL DEFAULT

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required fairly to present those claims to the highest court of the state for consideration. 28 U.S.C. §2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present the claims, his petition is subject to dismissal for failure to exhaust state remedies. *Id.; Anderson v. Harless*, 459 U.S. 4, 6 (1982)(*per curiam*); *Picard v. Connor,* 404 U.S. 270, 275-76 (1971). If, because of a procedural default, the petitioner can no longer present his claims to a state court, he has also waived them for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error. *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is precluded by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith,* 785 F.2d 135, 138 (6th Cir. 1986). "First, the court must determine that there is

a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id*. Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id.* Third, it must be decided whether the state procedural forfeiture is an 'adequate and independent' state ground on which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the Court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id*. This "cause and prejudice" analysis also applies to failures to raise or preserve issues for review at the appellate level. *Leroy v. Marshall*, 757 F.2d 94 (6th Cir. 1985).

In claim one, petitioner asserts that the prosecutor failed to disclose exculpatory evidence. In claim two, petitioner asserts that the grand jury was unconstitutionally selected and impaneled. He also asserts that jurors fell asleep during the trial, and that jurors told defense counsel they had doubt regarding petitioner's guilt. In claim three, petitioner asserts that he was denied the effective assistance of counsel because his attorney failed to file a written motion to sever the charges against him for trial.[2] In claim three, petitioner also alleges that during *voir dire*, "thing[s were] said off of the trial record... that were damaging to the reason... why the judge did not rule in favor of defendant." *See Petition*. Finally, in claim four, petitioner appears to assert that the trial court improperly instructed the jury. None of these claims have ever been presented to the state courts.[3]

---

[2] Trial counsel apparently made an oral motion to sever the charges, which motion was overruled by the trial court. *See* Exhibit 8 to Return of Writ.

[3] It is the position of the respondent that claims three and four were raised properly in post conviction, but are procedurally defaulted because petitioner never filed a timely appeal of

Claims two (grand jury unconstitutionally selected and impaneled; jurors fell asleep), four (improper jury instructions), and a portion of claim three (ineffective assistance of counsel for failing to file written motion to sever charges), raise issues that are readily apparent from the face of the record[4] and therefore should have been raised on direct appeal, but were not. Further, petitioner may now no longer raise such claims pursuant to Ohio's doctrine of *res judicata*. *See State v. Cole*, 2 Ohio St.3d 112 (1982); *State v. Ishmail*, 67 Ohio St.2d 16 (1981); *State v. Perry*, 10 Ohio St.2d 175 (1967).

Similarly, claim one (violation of *Brady v. Maryland*, 373 U.S. 83 (1963)), and a portion of claim three (things said off of the record during *voir dire*), rely on matters not readily apparent from the face of the record. Therefore, such claims should have been raised in petitioner's petition for post conviction relief, but were not. Again, petitioner may now no longer present such claim to the state courts under Ohio's doctrine of *res judicata. See State v. Cole*, supra; *State v. Ishmail*, supra; *State v. Perry, supra.*[5]

---

the trial court's decision denying his petition for post conviction relief, and Ohio does not permit delayed appeals in post conviction proceedings. *See* Return of Writ, at 9; *State v. Nichols*, 11 Ohio St.3d 40 (1984). However, upon review of the record it appears that, while petitioner did raise claims of ineffective assistance of trial counsel and ineffective trial judge in his petition for post conviction relief, such claims are not the same as those raised herein.  Petitioner's allegations are not entirely clear, however. This Court therefore deems the issue of procedural default to have been sufficiently raised by respondent as to all of petitioner's claims.

[4] Petitioner has attached to his petition a portion of the trial transcript, which indicates that the issue regarding sleeping jurors was made a part of the record in this case. *See Exhibits* to Petition.

[5] Arguably, petitioner may still present any claims that are not readily apparent from the face of the record in an untimely and successive petition for post conviction relief pursuant to O.R.C. §2953.23, which provides in relevant part:

A) Whether a hearing is or is not held on a petition filed pursuant to section 2953.21 of the Revised Code, a court may not entertain a petition filed after the

9

Because consideration of all of petitioner's claims is barred due to petitioner's failure to present these claims to any state court, the state courts were never given an opportunity to enforce the procedural rule due to the nature of petitioner's procedural default. This Court deems the first and second parts of the *Maupin* test to have been satisfied as to all of petitioner's claims.

The Court must next decide whether the procedural rules at issue constitute adequate and independent bases upon which to foreclose review of the petitioner's federal constitutional claims. This task requires the Court to balance the state's interests behind each procedural rule against the federal interest in reviewing federal claims. *See Maupin v. Smith*, 785 F.2d at 138.

Under this analysis, the procedural rules barring petitioner's claims for relief constitute

---

>expiration of the period prescribed in division (A) of that section or a second petition or successive petitions for similar relief on behalf of a petitioner unless both of the following apply:
>
>(1) Either of the following applies:
>
>(a) The petitioner shows that the petitioner was unavoidably prevented from discovery of the facts upon which the petitioner must rely to present the claim for relief.
>
>(b) Subsequent to the period prescribed in division (A)(2) of section 2953.21 of the Revised Code or to the filing of an earlier petition, the United States Supreme Court recognized a new federal or state right that applies retroactively to persons in the petitioner's situation, and the petition asserts a claim based on that right.
>
>(2) The petitioner shows by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted or, if the claim challenges a sentence of death that, but for constitutional error at the sentencing hearing, no reasonable factfinder would have found the petitioner eligible for the death sentence.

However, the exceptions for filing an untimely and successive post conviction action are strictly construed, and from the record before this Court, it appears highly unlikely that the Ohio courts would consider such an action.

adequate and independent state grounds for denying relief. The requirement that all available claims be asserted in the first appellate proceeding, or post conviction proceeding, serves the state's interest in finality and in ensuring that claims are adjudicated at the earliest possible opportunity. Further, the doctrine of *res judicata* is stated in unmistakable terms in numerous Ohio decisions and Ohio courts have consistently refused to review claims on the merits under that doctrine. *See State v. Cole, supra; State v. Ishmail, supra; State v. Perry, supra*.

The Court concludes that petitioner has waived his right to present all of his claims for federal habeas corpus review. Petitioner can still secure review of his claims on the merits if he demonstrates cause for his failure to follow the state procedural rules, as well as actual prejudice from the constitutional violations that he alleges. As cause for his procedural default, petitioner asserts the ineffective assistance of appellate counsel.

The ineffective assistance of counsel may constitute cause for a procedural default, so long as such claim has been presented to the state courts, and is not itself procedurally defaulted. *Edwards v. Carpenter,* 529 U.S. 446, 452-53 (2000), citing *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986). However, the ineffective assistance of counsel cannot constitute cause for petitioner's procedural default in failing to present claims in his petition for post conviction relief, since petitioner had no right to counsel in those proceedings. *See Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415, 425 (6th Cir. 2003), citing *Coleman v. Thompson*, 501 U.S. 722, 752-53 (1991); *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987)("[T]he right to counsel extends to the first appeal of right, and no further.") Similarly, the ineffective assistance of counsel cannot constitute cause for petitioner's failure to raise claims on direct appeal, because petitioner's delayed application to reopen the appeal was explicitly denied by the state courts for failure to establish good cause for the

untimely filing, *see* Exhibit 14 to Return of Writ, and thus, petitioner's claim of ineffective assistance of appellate counsel likewise is procedurally defaulted. *See Monzo v. Edwards*, 281 F.3d 568, 577-78 (6th Cir. 2002).

Beyond the four-part *Maupin* analysis, this Court is required to consider whether this is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. at 491; *see also Sawyer v. Whitley*, 505 U.S. 333. After review of the record, the Court does not deem this to be such a case.

### IV.

In view of all of the foregoing, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

If any party objects to this *Report and Recommendation*, that party may, within ten (10) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation* de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140 (1985); *United States*

*v. Walters*, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge
